GAMMAGE *et al. v.* ATLANTA & WEST POINT RAILROAD CO.

There being evidence to warrant the jury in finding that the homicide, for which the plaintiffs were legally entitled to sue, was caused by the running of the defendant's train, this evidence, in connection with the legal presumption of negligence against the company imposed by section 3033 of the code, was sufficient to carry the case to the jury, unless that presumption was fully rebutted by other evidence. The defendant having introduced no evidence at all, and it not appearing from the evidence for the plaintiffs that this presumption was in all respects completely rebutted, it was error to grant a nonsuit. *Atkinson, J.,* concurring specially.

March 11, 1895.  Argued at the last term.

Action for damages. Before Judge Van Epps. City court of Atlanta. March term, 1894.

*Goodwin & Westmoreland,* for plaintiff.
*Dorsey, Brewster & Howell,* for defendant.

LUMPKIN, Justice.

While it was not shown with absolute certainty that the deceased was killed by the defendant's train, there was ample evidence to warrant the jury in finding that such was the fact. This being so, and the plaintiffs having a legal right to sue for the homicide of their father, they were, in

view of the presumption of negligence arising against the company under section 3033 of the code, entitled to have their case passed upon by the jury, unless there were other facts in evidence by which the legal presumption was fully rebutted.    There is no law requiring a railroad company to introduce evidence of its own, for the purpose of overcoming the presumption of negligence imposed upon it by the statute.    It may rely solely upon the evidence introduced by the plaintiff; and if that evidence does remove the presumption, it will not be necessary for the company to offer any further defense.    In the present case, the defendant introduced no evidence at all, but stood upon the proposition that the evidence for the plaintiffs affirmatively vindicated the company's diligence, and demonstrated its non-liability.

It appears from the testimony, that the deceased came to his death "upon a dark, drizzling, rainy night," at a point on the railroad track which was a considerable distance from any public crossing; and that upon such a night, a good headlight would not disclose an object on the track at a greater distance than from fifty to seventy-five yards.    The train by which the deceased was presumably killed was running between twenty-five and thirty miles an hour.    There are at least two particulars in which the jury would have been warranted in finding that the company was wanting in the proper diligence.    It does not affirmatively appear that the locomotive was in fact supplied with a lighted headlight, and the evidence does not show that the train, when running at the rate of speed testified to, could not have been stopped, or its speed so reduced within the above mentioned distance as to have prevented the homicide.

Whether there was, or was not, any duty of looking out for persons who might happen to be on the track at the place where the homicide occurred, it was certainly incumbent on the company's servants in charge of the train to

stop it, if possible, after discovering the deceased in his buggy in front of the locomotive. The evidence does not negative the inference that he was so discovered when the locomotive had approached within a distance of seventy-five yards of him. With a headlight, the evidence shows he might have been seen for that distance; and if in fact seen, and it was possible either to stop the train, or to so reduce its speed as to avoid the collision entirely, or to render the consequences of it less disastrous, a verdict finding that the company's servants were negligent in omitting so to do could have been properly rendered. If, as matter of fact, it was impossible within the distance stated either to stop the train or to so check its speed as to prevent a fatal collision, the presence or absence of the headlight would seem to be immaterial; but on the theory that its light would disclose the presence of the deceased on the track in time to enable the company's servants to avoid injuring him, a jury would be authorized to find that the failure to have a lighted headlight was negligent.

From the foregoing it will be seen that the plaintiff's evidence did not necessarily make out a case of complete diligence on the part of the railroad company. Morally speaking, we might be at liberty to presume that the locomotive was supplied with a headlight, and also, that within a distance of seventy-five yards, the "cannon-ball" train could not have been stopped or its speed appreciably reduced. In all probability, this was the real truth of the matter; but we cannot judicially so assume, and are constrained to and the case back in order that these questions may be passed upon by the jury.

In our consultation upon this case, two other questions were discussed. They were: (1) whether or not the company's servants were under any duty of looking out for human beings upon its track at the point where the homicide occurred; and (2) if not, whether, in the absence of actual knowledge of the presence of the deceased upon

the track in a situation of peril, the company, relatively to him, was under any duty of checking or regulating the speed of its train. As it was not absolutely necessary to definitely decide these questions, and we were not entirely agreed in our views concerning the same, they are left open, as it may transpire that a full development of all the facts will eliminate both questions from the case.

*Judgment reversed.*

ATKINSON, Justice, concurring.

I think the court reached a correct conclusion in this case; but inasmuch as the opinion seems to place the judgment of reversal upon special grounds, leaving out of consideration other theories upon which, according to my understanding of the law, the plaintiffs might be entitled to recover independently of the special grounds referred to, I deem it my duty to state the considerations which influenced me to the conclusion reached, lest perchance my silence might be construed into an acquiescence in a judgment based upon reasoning which seems to negative the right of the plaintiffs to recover upon such theories.

The plaintiffs brought an action for the homicide of their father, and upon the conclusion of the evidence, a nonsuit was awarded. To a correct understanding of the questions made in the case, it is necessary that an outline of the testimony be given. It appears from the evidence, that the person for whose homicide this action was brought was killed under the following circumstances: He lived near the city of Atlanta. His route to his home from the city led across the track of the defendant company within and very near the corporate limits of the city, at a point where the track of the Central Railroad Company runs parallel to that of the defendant, both companies using in common the two tracks—one for ingress to and the other for egress from the city. On the afternoon of the homicide the deceased was in Atlanta, and was last seen alive at about four or half past

v 97-5

four o'clock in the city. He was driving a horse attached to a buggy. He was next seen lying dead upon the front of an engine of the defendant, about eleven hundred yards, in the direction of the city, from the point where the road to his home crosses the track of the defendant company. On the next morning the horse he was driving was brought home with the harness and shafts of the buggy hung to him. Upon investigation on the morning following the night of the homicide, traces of blood were seen leading from the point where the body of the deceased was first found upon the engine of the defendant to a point on the line of its road about five hundred yards distant from and in the direction of the crossing above referred to. At this point and for some distance between the point where the body was found and the point where traces of blood were first discovered, fragments of the buggy of the deceased were found scattered along the railroad track. From the point where the blood was first discovered back to the public crossing, a distance of about six hundred yards, were seen the tracks of the horse driven by the deceased, which indicated that the animal was running at a high rate of speed, the buggy, as shown by its tracks, being at some times on and sometimes off the track of the defendant company. At the crossing above referred to, which was a public crossing and much frequented by travelers, were seen the tracks of the horse and buggy as they were driven on the crossing from the direction of Atlanta leading toward the home of the deceased. As the horse was about to cross the track of one of the roads, its tracks indicated that it had suddenly become frightened and started off down the line of the defendant's road in the direction where the body of the deceased was found, and according to the testimony of the witnesses who examined the scene, the horse was running at a high rate of speed, estimated to be as much as a mile in three minutes, ultimately leaving the track at about the point where the traces of blood first showed on the ties.

For a distance of about five hundred yards before reaching the public crossing above mentioned, the track of the defendant company is straight. From the crossing in the direction of the city of Atlanta, there is a curve extending for about sixteen hundred feet. The deceased was taken off of the engine of the defendant about 8 o'clock at night. It was cloudy and drizzly. The train was running at a speed of about twenty-five or thirty miles an hour. It was shown that with a good headlight on the engine, an object could be seen on such a night about fifty or seventy-five yards. No evidence was submitted showing that the servants of the defendant company did not see the deceased, or could not have seen him by the exercise of ordinary care in time to prevent his homicide. There was no evidence showing that they made the slightest effort to avoid killing the deceased; no evidence that they complied with any of the statutory provisions in regard to blowing the whistle and checking the engine before reaching the public crossing at which the horse of the deceased began to run. There was evidence showing the value of the life of the deceased and the right of the plaintiffs to recover.

The judgment for nonsuit appears from the record to have been based upon the proposition, that the homicide occurring under the circumstances above detailed, the defendant company was not liable. That judgment this court reverses.

My brethren seem to place their judgment of reversal upon the ground that the evidence does not negative the inference that the deceased was discovered when the locomotive approached within seventy-five yards of him, and if within that distance the train could have been stopped and was not, the plaintiffs could recover, intimating that with evidence showing that a headlight was burning and that the train could not have been stopped within the distance stated, the judgment of nonsuit would have been proper.

To this conclusion I cannot give my assent. Accord-

ing to the view I take of the law, the judgment of the court should be placed upon the broad ground, that with the omitted evidence before the jury, it would still be a question of fact as to whether the defendant's servants exercised, with respect to the deceased, in view of his position, such ordinary and reasonable care as the law enjoins upon it.

That the deceased was killed by the engine of the defendant, no candid mind, under the evidence submitted, can seriously question; at all events, a verdict finding that such was the fact would be supported by the overwhelming weight of the evidence. This fact ascertained, the law raises the presumption of negligence, from the consequences of which the defendant can only escape by showing that its servants were in the exercise of ordinary care, or, they being negligent, the deceased, by the exercise of ordinary care, could have avoided the consequences of their neglect. In either event, the question was one of fact for a jury. There is no law which requires that locomotives of railroad companies should be equipped with headlights, and no law which declares that the omission to have them is negligence, or that having them relieves railroad companies from liability for injuries inflicted by its employees; so that neither this court, nor any other, has power to judicially declare upon this question of fact that the absence of a headlight proves negligence, or its presence proves diligence in favor of the company. The maintenance of a headlight may or may not be a necessary precaution, as a jury, under all the circumstances of a given case might consider its absence negligence or its presence diligence. The fact that the engine had no headlight, could not be considered a circumstance even showing negligence, unless the servants and agents of the company were under a duty to look ahead to prevent injury to persons or property which might be upon the track; and to insist upon the headlight as a necessary and indispensable precautionary measure, involves the admission that such particular duty rests upon the company,

for certainly the omission to have the facilities of seeing could not be construed to be negligence, when the omission to see would not be; in other words, if they are under no duty to look, they are under no duty to furnish the means of seeing.   It therefore is only upon the theory that the defendant's servants are bound to look ahead, that the omission to have a headlight could be regarded as negligence.   Moreover, unless it be admitted that the exercise of ordinary care involved keeping a lookout, and this latter proposition the majority of the court seem to doubt, I cannot understand from whence my brethren draw the inference that the deceased would have been discovered when the headlight came within seventy-five yards of him.   This inference, if one of fact, I submit, with the utmost deference, this court has no right to draw against the company; that should have been left to the jury.   If an inference of law, it can only arise from the presumption that the defendant's servants were on the lookout, and this presumption does not arise except upon the supposition that it was their duty to be on the lookout, and upon the further presumption that inasmuch as every one is presumed to do his duty, the contrary will not be presumed.   The presumptions thus indulged are all in favor of, while the laws says they shall be against the company.   In order to uphold the judgment on the line adopted by the majority, we must presume that the defendant's servants were diligent; that they were on the lookout to prevent inflicting injuries, and were only prevented from doing so because of the absence of a headlight.   The law, on the contrary, presumes that they were negligent; that they were not on the lookout; that they took no precaution to prevent the infliction of the injuries resulting in the death of the deceased.   These considerations lead me to doubt the soundness of the reasons assigned by the majority for the conclusion reached by the court; and I prefer to place my own judgment upon the broader ground that even if, as opposed to the doctrine of

the maxim *sic utere tuo ut alienum non laedas,* it could
be considered doubtful whether the defendant company
owed the deceased the duty of ordinary care, in view of the
nature of its business, (and such doubts I do not myself en-
tertain,) inasmuch as the statute imputes negligence to the
defendant whenever it is shown that a person has been in-
jured by the running of its cars, it raises by necessary
implication in favor of such person a duty of diligence upon
the part of the defendant's servants which can only be met
by showing, in case of injury, that its servants were in the
exercise of ordinary and reasonable care.   Just what facts
will amount to ordinary care on the one hand, or negli-
gence upon the other, in the absence of a statute declaring
what things shall constitute negligence and what acts shall
constitute diligence, must always be a question of fact for
a jury.

In the present case, upon this motion for nonsuit, the
question as to whether the deceased was himself guilty of
such negligence as would defeat a recovery cannot be con-
sidered, for there is ample evidence from which a jury could
infer as a matter of fact that the deceased did not
voluntarily expose himself to an open and unnecessary
hazard.   There is ample evidence from which a jury could
find that he was carried against his will by a superior force
(a runaway horse) into a situation of peril from which he
could not even by the use of the most extraordinary care
extricate himself; and it should have been left to a jury to
say whether, being himself free from fault, the railroad
company discharged to him the duty of ordinary care im-
posed by statute in his favor upon the servants of the
company.   Of course no fixed rule can be laid down by
which to measure in each instance that amount of care
which will meet the requirements of ordinary diligence as
imposed by law.   There may be localities where even slight
attention to the matter of speed of engines or of keeping a
lookout in advance would amount to ordinary care.   In

others the most constant vigilance may be required to vindicate the company against a charge of negligence. The question then is, was this a case in which due diligence required the company to keep a lookout? If so, was the locomotive equipped with a headlight so as to enable the servants of the company to see ahead? If so, were they endeavoring to see? If not so endeavoring, could they have seen had they been on the lookout? If they could see, ought to have seen or did see the deceased, what effort was made to prevent injury to him? The trial court, by its judgment of nonsuit, resolved all these questions of fact in favor of the defendant. Reviewing this judgment, I will not undertake to say as a matter of law that a lookout was necessary; that in order to maintain a lookout, it was necessary to keep a headlight; that there was or was not a headlight upon the engine; that with a headlight, the servants of the company ought to have seen, could have seen or did see the deceased in time to take precautionary measures to prevent injury to him. All such are questions of fact, and a jury should be allowed to say as matter of fact whether running a locomotive through a populous city on a dark, drizzly night, at a rate of speed approximately twenty-five miles an hour, is negligence, and whether the company answers the statutory demand of diligence by simply proving that its servants did not in fact see the person involuntarily upon its track in time to prevent his homicide. If so, then railroad companies should, for their own protection, employ either blind engineers or men so indifferent to human life as that they will not try to see. Otherwise, if they be under no duty to keep a lookout and are only answerable for the homicide of a person so situated in the event its servants see him in his perilous position in time to prevent his homicide, a humane engineer with good eyesight might chance to see such an unfortunate, but for some unaccountable reason not in time to prevent his homicide, and thus expose the company to liability.

Aside from these considerations, there is yet another reason why this nonsuit should have been refused. There was evidence from which the jury could have inferred that the deceased, without warning of danger, drove upon this public crossing of the defendant's road, and that his horse, though ordinarily gentle, took fright at the approaching engine of the company, and that this occurred in consequence of a non-compliance by the company's servants with the statutory provision touching the blowing of whistle and checking the speed of its engine, and becoming thus frightened, ran away, taking the track of the company and continuing ahead of the approaching train until the deceased was slain. There is no evidence of a compliance on this occasion with the statutory provisions above referred to, and there is evidence that the mad race of the frightened horse commenced on the public crossing, where the deceased had a right to be, and where the company owed to him a special duty, with which it made no effort to comply. If, under these circumstances, the horse driven by the deceased became uncontrollable (and this can be inferred from the evidence, for it will not be presumed that the deceased voluntarily drove upon the track of the defendant company, thus exposing him to certain danger), and being beyond the control of the deceased, ran away, taking the track of the approaching train, and under such circumstances the driver was overtaken and killed by the train, the primary negligence touching the special statutory duty to check should be treated as continuing, and as the proximate cause of the injury; and hence, whatever might have been the duty of the company's servants as to keeping a lookout at points other than public crossings, the injury inflicted under such circumstances would be referable to such primary negligence, and the company would be liable. To hold that the defendant company could excuse the homicide by bare proof that the killing actually occurred at a point other than a public crossing, would allow the company to

justify its conduct by proof of its own negligence. It would be equivalent to admitting, as a good defense from the company, this reply to a person injured: You had a right to be on the public crossing. Had you been injured there, I would have been liable. Instead, however, of injuring you on the crossing, I have, by disregarding the statutory requirements established for your protection, caused your horse to run away, and have been thus enabled negligently to injure you at another point where I am at liberty to treat you as a trespasser, and thus escape liability. Thus, under shelter of its own wrong, it would be permitted to seek protection; and this is contrary to one of the oldest and most universal and salutary principles of the law.